Robert R. Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Deborah De Villa (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile: (310) 474-8585

*Attorneys for Plaintiffs and the Putative Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACOB WINKELVOSS, SETH PURVIN, DOUGLAS BUTTS and ADITYA GUPTA individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA and VERISK ANALYTICS, INC.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Violations of New York General Business Law<br>2) Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act<br>3) Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law<br>4) Intrusion Upon Seclusion<br>5) Unjust Enrichment<br>6) Violation of the Fair Credit Reporting Act<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jacob Winkelvoss, Seth Purvin, Douglass Butts, and Aditya Gupta (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them and on information and belief as to all other matters, by and through undersigned counsel, hereby bring this Class Action Complaint against Defendants Hyundai Motor America ("Hyundai") and Verisk Analytics, Inc. ("Verisk" and, collectively with Hyundai, "Defendants").

## NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased a vehicle from Hyundai and had their location data provided to Verisk.

2.     This action is brought to remedy violations of law in connection with Defendants' unlawful collection and dissemination of Plaintiffs' and Class Members' vehicle driving data through the telematics system in their vehicles. The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class Member is of diverse citizenship from Defendants, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

4.     The Court also has federal question jurisdiction over Plaintiffs' claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*

5.     The Court has personal jurisdiction over Defendants and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred within this District. Defendant Hyundai has a principal place of business in this District and has marketed, advertised, sold, and leased vehicles

within this District. Plaintiffs are informed and believe that Defendant Verisk marketed, advertised, and sold its services within this District.

## PARTIES

6.      **Plaintiff Jacob Winkelvoss** is an adult resident and citizen of Pennsylvania. In or around November 2023, Plaintiff Winkelvoss purchased a new 2023 Hyundai Elantra from Pacifico Hyundai, an authorized Hyundai dealership in Philadelphia, Pennsylvania. At the time of purchase, Plaintiff Winkelvoss was enrolled in Hyundai's connected service, Bluelink, for the complimentary period. At no time was he appropriately alerted to the fact that Hyundai would collect and share his vehicle driving data through the Bluelink service.

7.      Plaintiff Winkelvoss is informed and believes that his data, including location data, was provided to third parties, including, but not limited to, his auto insurance provider. This has led Plaintiff Winkelvoss to pay more than he otherwise would have for his auto insurance.

8.      **Plaintiff Seth Purvin** is an adult resident and citizen of New York. Plaintiff Purvin purchased a new 2022 Hyundai Ioniq 5 from Millenium Hyundai, an authorized Hyundai dealership in New York.  At the time of purchase, Plaintiff Purvin was enrolled in Hyundai's connected service, Bluelink, for the complimentary period. At no time was he appropriately alerted to the fact that Hyundai would collect and share his vehicle driving data through the Bluelink service.

9.      Plaintiff Purvin is informed and believes that his data, including location data, was provided to third parties, including, but not limited to, his auto insurance provider. This has led Plaintiff Purvin to pay more than he otherwise would have for his auto insurance.

10.     **Plaintiff Douglass Butts** is an adult resident and citizen of Illinois. Plaintiff Butts purchased a new 2021 Hyundai Tucson in or around May 2021 and a new 2022 Hyundai Tucson in or around February 2022 from Schimmer Hyundai, an authorized Hyundai dealership in Peru, Illinois.  At the time of each purchase, Plaintiff Butts was enrolled in Hyundai's connected service, Bluelink, for the complimentary period. At no

time was he appropriately alerted to the fact that Hyundai would collect and share his vehicle driving data through the Bluelink service.

11.     Plaintiff Butts is informed and believes that his data, including location data, was provided to third parties, including, but not limited to, his auto insurance provider. This has led Plaintiff Butts to pay more than he otherwise would have for his auto insurance.

12.     **Plaintiff Aditya Gupta** is an adult resident and citizen of New Jersey. Plaintiff Gupta purchased a new 2022 Hyundai Elantra Sel 5 from Millenium Hyundai, an authorized Hyundai dealership in New York. At the time of purchase, Plaintiff Gupta was enrolled in Hyundai's connected service, Bluelink, for the complimentary period. At no time was he appropriately alerted to the fact that Hyundai would collect and share his vehicle driving data through the Bluelink service.

13.     Plaintiff Gupta is informed and believes that his data, including location data, was provided to third parties, including, but not limited to, his auto insurance provider. This has led Plaintiff Gupta to pay more than he otherwise would have for his auto insurance.

14.     Furthermore, Plaintiff Gupta has repeatedly been denied coverage by other insurers when he wanted to change his insurance provider. Plaintiff Gupta is not aware of any reason other than the vehicle driving data that may have been provided to insurers that would justify the denial of coverage from insurers.

15.     **Defendant Hyundai Motor America, Inc.** is a corporation headquartered in Fountain Valley, California, and incorporated under the laws of California. Hyundai is a wholly owned subsidiary of the Hyundai Motor Company, a multinational automotive manufacturer based in South Korea. Hyundai is responsible for sales, marketing, service, distribution, import, and export of Hyundai-branded products, including vehicles and parts, in the United States. Hyundai is also the warrantor and distributor of Hyundai vehicles throughout the United States.

CLASS ACTION COMPLAINT

16.     **Defendant Verisk Analytics, Inc.** is a United States public corporation headquartered in Jersey City, New Jersey, and incorporated under the laws of Delaware. Verisk is a global data and analytics company that provides data and technology services, analytics, predictive insights, and fraud prevention for a wide range of industries.

## FACTUAL BACKGROUND

### Vehicle Owner Tracking

17.     Automobiles hold a special place in American culture as a symbol of freedom and autonomy, a ticket to the open road. However, as explained in a guide published by the non-profit Mozilla Foundation, "[m]odern cars are surveillance-machines on wheels souped-up with sensors, radars, cameras, telematics, and apps that can detect everything we do inside -- even where and when we do it. Whether that means singing at the top of your lungs, engaging in hanky panky in the back seat, or driving to a domestic violence shelter, cars are an increasingly unsafe place to be yourself."[1]

18.     Regulators around the world have raised concerns about the volume of personal data collected by vehicles that increasingly gather, store, and transmit information for entertainment, performance, and safety purposes. Last year, California nonprofit Consumer Watchdog told the state's regulator that "car data is the new gold rush of the auto industry . . . Automakers and third-party companies know where we drive, what we buy, eat, our texts. A whole consumer profile is created with this information to essentially sell you things."[2]

19.     Recently, the *New York Times* reported that car manufacturers are tracking drivers' behavior through internet-connected vehicles, and sharing it with data brokers such

---

[1] Jen Caltrider, et al., *After Researching Cars and Privacy, Here's What Keeps us up at Night*, MOZILLA (Sept. 6, 2023), https://foundation.mozilla.org/en/privacynotincluded/articles/after-researching-cars-and-privacy-heres-what-keeps-us-up-at-night/.

[2] David Shepardson, California agency probes automakers' data privacy practices, Reuters (July 31, 2023), https://www.reuters.com/business/autos-transportation/california-agency-probes-automakers-data-privacy-practices-2023-07-31/.

as LexisNexis and Verisk.[3] The *New York Times* further explained that a number of car manufacturers have started offering optional features in their connected-car apps that rate people's driving. Drivers likely do not realize that, if they turn on these features, the car companies then give information about how they drive to data brokers like LexisNexis and Verisk. These data brokers in turn create "consumer disclosure reports" on individuals, which they sell to insurance companies providing insurance to those individuals. The consumer disclosure reports show the length of trips and driving behavior, such as "hard braking," "hard accelerating" and speeding. Insurance companies can use those reports to assess the risk of a current or potential customer, and adjust rates or refuse coverage based on the findings.

20. For example, Hyundai's Bluelink provides features such as remote start capabilities, diagnostics and alerts, and emergency assistance in addition to feedback based on driving behavior. Kia, Mitsubishi, General Motors, and both Honda and its Acura luxury arm all offer similar driver coaching systems as well. All of these programs collect information about a driver's mileage, speed, braking, and acceleration, which are then shared with LexisNexis or Verisk.

21. The *New York Times* highlighted the case of Kenn Dahl, the driver of a leased Chevrolet Bolt, who learned that he and his wife's driving habits were being tracked when an insurance agent told him in 2022 that his LexisNexis report was a factor behind his insurance premium jumping by 21%. While many automakers and data brokers claim that they do not collect information without vehicle owner's consent, the manner in which consent is obtained is often suspect. Consumers' consent, like Kenn Dahl's, is frequently achieved by getting them to sign off on disclosures, with no specific explanation of the data collection in the fine print.

---

[3] Kashmir Hill, *Automakers Are Sharing Consumers' Driving Behavior With Insurance Companies*, N.Y. Times (Mar. 11, 2024), available at https://www.nytimes.com/2024/03/11/technology/carmakers-driver-tracking-insurance.html.

CLASS ACTION COMPLAINT

22.     Following reports, Senator Ed Markey, a Democrat from Massachusetts, sent letters to 14 automakers urging them to implement stronger privacy policies for consumers. Last month, dissatisfied by automakers' evasive answers, Sen. Markey asked the Federal Trade Commission (FTC) to investigate car manufacturers' data collection practices. Sen. Markey wrote:

> With new advances in vehicle technology and services, automakers have been vacuuming up huge amounts of data on drivers, passengers, and even individuals outside the vehicle. Based on public reporting and responses to my own inquiries into these practices, automakers face few, if any, limitations on the collection, use, and disclosure of this data. Consumers are often left in the dark. I therefore urge the FTC to investigate the automakers' data practices and take all necessary actions to protect the privacy of all road users.

23.     Sen. Markey continued to explain that in their responses, the automakers largely failed to answer important questions about whether they use the data for their own commercial benefit, whether a consumer loses functionality by refusing to consent to the data collection, and whether the manufacturers have suffered a cyberattack in recent months. In addition, 12 of the 14 automakers wrote that they provide data to law enforcement, with most doing so only in response to a subpoena, warrant, or other legal order.

### *Hyundai Sends Location Data to Verisk*

24.     Through Bluelink, Hyundai provides subscription-based communications, in-vehicle security, emergency services, turn-by-turn navigation, and remote diagnostics mechanisms utilizing vehicles' onboard telematics system.

25.     Hyundai's Bluelink Driving Score program provides customers with information about their driving behavior to help them maximize their vehicle's overall performance, reduce vehicle wear and tear, and encourage safer driving. Hyundai promotes this service by enrolling customers with Bluelink-enabled vehicles in its Driving Score program. Bluelink Connected Car Service is complimentary for a limited time as part of every new vehicle purchase.

CLASS ACTION COMPLAINT

26.     Hyundai described the program as "a Bluelink feature conceived and launched to help customers better understand their driving habits, similar to fitness tracking on a smartwatch. Customers were able to share their driving data with third parties to generate the Drive Score and driving coaching tips."[4]

27.     Customers can enroll in Bluelink at the time of vehicle purchase through their dealer, or at a later date, using either their MyHyundai mobile app, or by visiting the following website: https://owners.hyundaiusa.com/us/en/index.

28.     Hyundai provides a webpage of answers to frequently asked questions, including information on how they treat the consumer data that their system collects. For example, as of May 22, 2024, Hyundai has posted and answered the following questions[5]:

**What Hyundai vehicles are equipped with Bluelink?** ⌃

Bluelink launched on the 2012 Sonata and is currently available on most 2013 and newer Hyundai models. Vehicles later than 2013 that are *not* equipped with Bluelink include 2013 - 2017 Accent, 2013 Elantra sedan and 2013 Tucson.

---

[4] https://owners.hyundaiusa.com/us/en/resources/blue-link/what-is-a-hyundai-driving-score (last accessed May 23, 2024).

[5] https://www.hyundaiusa.com/us/en/blue-link (last accessed May 23, 2024).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Where can I get the Bluelink app?** ∧

Bluelink features can be accessed within the MyHyundai app, which can be downloaded directly from the Apple App store* and Google Play*  on your mobile device.

**How does Enhanced Roadside Assistance work?** ∧

Enhanced Roadside Assistance works in conjunction with your vehicle's Hyundai Assurance 24/7 Roadside Assistance coverage. GPS coordinates for your vehicle will be provided to the Bluelink Customer Care agent when making a Roadside Assistance call from inside the vehicle using the Bluelink button.

**How does Stolen Vehicle Recovery work with local police to recover my vehicle?** ∧

If your Hyundai vehicle is stolen, file a stolen vehicle report with your local police department immediately. The Bluelink Customer Care agent will need a report number to help police find the location of your vehicle.

**How do I sign up for Bluelink?** ∧

To sign up for Bluelink, create a MyHyundai account or log in to your existing MyHyundai account.

1. Go to owners.hyundaiusa.com and click REGISTER if you need to create an account.
2. Follow the quick and easy steps on the screen to set up your account. You will need your Vehicle Identification Number (VIN) to complete enrollment.
3. Use the account you created to sign in to the MyHyundai with Bluelink app or manage your account on MyHyundai.com.

CLASS ACTION COMPLAINT

29.    Hyundai has also published an extensive User's Manual for its Bluelink services. The User's Manual contains no references to Bluelink's collection or dissemination of driving data or how customers can opt out of driving data collection.[6]



## Setting Bluelink Preferences and alerts

1. To get started with Bluelink, log on to www.MyHyundai.com and select Bluelink from side menu.

Bluelink Home page

2. Selecting Preferences and Alerts

This is where the rubber hits the road - where you are able to select, activate, adjust and control the settings for the Bluelink system in your Hyundai. Explore everything! You might be surprised at how easy to use - and practical - many of these amazing features are:

- Add Secondary Drivers
- Add Emergency Contacts
- Update Bluelink PIN
- Set Notifications
- View Monthly Vehicle Health Report
- Activate Remote Features
- Destination Search by Voice
- Geo-Fence*
- Speed Alert*
- Curfew Alert*

---

[6] https://owners.hyundaiusa.com/content/dam/hyundai/us/myhyundai/manuals/factory-warranty/2022/Bluelink-User-Manual.pdf (last accessed May 23, 2024).

CLASS ACTION COMPLAINT

30.     Nowhere in these frequently asked questions or Bluelink User's Manual did Hyundai reveal that it was providing extensive consumer data to Verisk, who was in turn sending it to auto insurers.

31.     Verisk boasts that its data platform for insurers, the Verisk Data Exchange, "works with numerous automotive and property-based data sources, applying artificial intelligence and advanced analytics to generate insights that enable superior decision-making across the life cycle of insurers' telematics programs. With over 7.6 million vehicles and 240 billion miles of driving data, the Exchange is one of the largest of its kind and continues to grow by over 200,000 new vehicles every month."[7]

32.     A Verisk press release from 2018 announcing the partnership between Hyundai and Verisk offers insight to the vehicle driving data collection and dissemination scheme: "Hyundai owners and lessees will gain access to their Verisk Driving Score[TM], a simple metric that assesses individual driving behavior. Insurers can use scores from the Verisk Data Exchange to support usage-based insurance (UBI) programs through a related rating rule . . . ."[8] Manish Mehrotra, director of digital business planning and connected operations at Hyundai Motor America, stated that "Hyundai customers will have access to their portable Verisk Driving Score, which can lead to discount offers on UBI programs and support driver feedback that helps improve their driving."[9] In 2018, the Verisk Data Exchange received driving data from 32 percent of the total U.S. market share of automakers.[10]

---

[7] https://www.hyundainews.com/assets/documents/original/45429-HMAUBIPressRelease3222021AVwithdisclaimersnrabmj.pdf (last accessed May 23, 2024).

[8] https://www.verisk.com/company/newsroom/hyundai-joins-the-verisk-data-exchange/ (last accessed May 23, 2024).

[9] *Id.*

[10] *Id.*

33.     One reason insurers benefit from gathering telematics information is the recent increase in insurance costs. A recent analysis by the U.S. Bureau of Labor Statistics found insurance costs have risen 71% in the last decade and 18% in just the first half of last year.  Higher repair costs are partly to blame. Today's cars are complex devices full of expensive electronics, often in vulnerable places. Parking sensors, blind-spot monitors, and automatic emergency braking systems all require sensors placed on the exterior of a car. Even a minor accident can require replacing thousands of dollars' worth of electronics.

34.     As a result of Defendants' misconduct, Plaintiffs and the other Class Members were each injured on account of their vehicle location being shared with third parties, including, but not limited to, the insurance companies that provide them insurance and/or other insurance companies where Plaintiffs and the other Class Members applied for insurance. Accordingly, the vehicles purchased by Plaintiffs and the other Class Members were fundamentally different from what they believed they were purchasing, less valuable than was represented, and less valuable than what they actually received.

35.     To date, Plaintiffs' and Class Members' data is still in the possession of Defendants and unknown third parties. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiffs and the other Class Members. As a result, Plaintiffs, at this stage of the litigation, seek both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction enjoining Defendants and their agents, servants, and employees, and all persons acting under, in concert with, or for them, from selling or otherwise disseminating Plaintiffs' and Class Members' data, and requiring that data's destruction.

## **TOLLING OF STATUTES OF LIMITATIONS**

36.     Defendants had exclusive knowledge of their activity to collect and utilize Plaintiffs' and Class Members' data and knew their activity would not be discovered by Plaintiffs and Class Members.

37.     Thus, any applicable statute of limitations has been tolled by Defendants' actions and Defendants are estopped from pleading the statute of limitations because they failed to disclose the facts they were obligated to disclose concerning their activity.

## CLASS ALLEGATIONS

38.     All Plaintiffs seek certification, under Fed. R. Civ. P. 23(a)(b)(2), and (b)(3), of the following class "Nationwide Class":

**Nationwide Class**

All persons and entities in the United States whose vehicle driving data was collected, stored, distributed, and/or sold by Defendants.

39.     In the alternative to the Nationwide Class, Plaintiff Winkelvoss seeks certification of the following "Pennsylvania Class":

**Pennsylvania Class**

All persons and entities in the Commonwealth of Pennsylvania whose vehicle driving data was collected, stored, distributed, and/or sold by Defendants.

40.     In the alternative to the Nationwide Class, Plaintiffs Purvin and Gupta seek certification of the following "New York Class":

**New York Class**

All persons and entities in the State of New York whose vehicle driving data was collected, stored, distributed, and/or sold by Defendants.

41.     In the alternative to the Nationwide Class, Plaintiff Butts seeks certification of the following "Illinois Class":

**Illinois Class**

All persons and entities in the State of Illinois whose vehicle driving data was collected, stored, distributed, and/or sold by Defendants.

42.    All Plaintiffs also seek certification of the following, nationwide "FCRA Class":

> **FCRA Class**
>
> All persons and entities in the United States whose vehicle driving data was included in consumer reports created and/or disseminated by Defendant Verisk.

43.    The Nationwide Class, Pennsylvania Class, New York Class, Illinois Class, and FCRA Class are referred to collectively as the "Classes" or "Class."

44.    Excluded from the Classes are: (i) Defendants and their officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class Members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

45.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

46.    **Numerosity:** The members of the Class are so numerous that joinder of all Class Members in a single proceeding would be impracticable. While the exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that tens of thousands of vehicle owners have had their location data collected, stored, distributed, and/or sold by Defendants.

47.    **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a.   whether Defendants engaged in the conduct alleged herein;

b.   whether Defendants omitted and misrepresented material facts to purchasers and lessees of vehicles;

c.   whether Defendants' omissions and misrepresentations regarding the vehicles were likely to mislead a reasonable consumer;

d.   whether Plaintiffs' and the other Class Members' vehicles were worth less than as represented as a result of the conduct alleged herein;

e.   whether Plaintiffs and other Class Members have been damaged and, if so, the extent of such damages;

f.   whether Defendant Verisk's actions constitute a violation of the FCRA; and

g.   whether Plaintiffs and other Class Members are entitled to equitable relief, including, but not limited to, restitution and injunctive relief.

48.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

49.   **Typicality:** Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, Plaintiffs and the other Class Members were injured through the substantially uniform misconduct described above. Like Plaintiffs, Class Members also purchased or leased a vehicle that collected, stored, distributed, and/or sold data about the vehicle to third parties. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and no defense is available to Defendants that is unique to any Plaintiff. The same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class Members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendants' wrongful conduct in collecting, storing, distributing, and/or selling their location data.

50.     **Adequacy:** Plaintiffs are adequate Class representatives because they will fairly represent the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and privacy class action cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class they represent and have the resources to do so. Neither Plaintiffs nor their counsel have interests adverse or antagonistic to those of the Class.

51.     **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

52.     Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Defendants maintain regarding Plaintiffs' and the Class Members' vehicles and location data.

**CAUSES OF ACTION**
**COUNT I**
**Violations of New York General Business Law**
**N.Y. Gen. Bus. Law § 349 ("GBL")**
**(On Behalf of Plaintiffs Purvin and Gupta and the New York Class)**

53.     Plaintiffs Purvin and Gupta ("Plaintiffs" for the purposes of this count) reallege and incorporate all previous allegations as though fully set forth herein.

54.     Plaintiffs bring this cause of action individually and on behalf of the New York Class (the "Class" for the purposes of this count).

55.     Section 349 of the New York GBL provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

56.     Defendants, while operating in New York, engaged in deceptive acts and practices in the conduct of business, trade and commerce, and the furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a). This includes but is not limited to the following:

     i.   collecting and disseminating Plaintiffs' and Class Members' vehicle driving data, including location data;

     ii.  failing to enact proper opt-in procedures before collecting and disseminating Plaintiffs' and Class Members' vehicle driving data, including location data;

     iii. knowingly and fraudulently providing Plaintiffs' and Class Members' driver's license information directly to members of the public with small amounts of their PI;

     iv.  omitting, suppressing, and concealing the data collection and dissemination practices of Defendants; and

v.   knowingly and fraudulently misrepresenting that Defendants would comply with the requirements of relevant federal and state laws pertaining to the privacy Plaintiffs' and Class Members' vehicle driving data, including location data.

57.    As a direct and proximate result of Defendants' data collection and dissemination practices, Plaintiffs and other Class Members suffered injury and/or damages, including, but not limited to, actual misuse of their vehicle driving data, including location data; production and dissemination of uncontextualized, misleading, and personal driving information in the consumer reports disseminated; and increased insurance premiums and/or denials of coverage.

58.    The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and other Class Members that they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

59.    In view of their decision to collect and disseminate vehicle driving data, including location data, Defendants knew or should have known that their practices were negligent, knowing and willful.

60.    Plaintiffs and Class Members seek relief under N.Y. Gen. Bus. Law § 349(h), including but not limited to actual damages (to be proven at trial), treble damages, statutory damages, injunctive relief, and/or attorney's fees and costs.

61.    Plaintiffs and Class Members seek to enjoin such unlawful deceptive acts and practices described above. Each Class Member will be irreparably harmed unless the Court enjoins Defendants' unlawful, deceptive actions, in that Defendants will continue to collect, store, disseminate, and/or sell Plaintiffs' and Class Members' vehicle driving data, including location data, as detailed herein.

62.    Plaintiffs and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendants from continuing to disseminate its false and misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

**COUNT II**
**Violations of the Illinois Consumer Fraud and**
**Deceptive Business Practices Act ("ICFA")**
**815 Ill. Comp. Stat. § 505/1, *et seq*.**
**(On Behalf Plaintiff Butts and the Illinois Class)**

63.    Plaintiff Butts ("Plaintiff" for the purposes of this count) re-alleges and incorporates by reference all other paragraphs of this complaint as though fully set forth herein and bring this claim on behalf of himself and the Illinois Class (the "Class for the purposes of this count)

64.    Plaintiff and the Class are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiff, the Class, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

65.    Defendants engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engage in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

66.    Plaintiff may bring claims under the ICFA because there is a "consumer nexus" between Plaintiff and consumers with respect to Defendants' unfair and deceptive trade practices.

67.    Plaintiff's actions were akin to a consumer's action because he justifiably relied on Defendants' public statements and omissions regarding their privacy practices. Specifically, Defendants' statements omitted any representation concerning their collection, storage, dissemination, and/or sale of Plaintiff's and Class Members' vehicle driving data.

68.     Defendants' representations and omissions as to their data collection and dissemination practices concern all individuals because a reasonable consumer, akin to Plaintiff, does or is reasonably likely to rely on these statements in purchasing Defendants' goods or services.

69.     Defendants' conduct involved consumer protection concerns because Defendants omitted any representation to consumers that Plaintiff's and Class Members' vehicles collected and disseminated driving data to third parties.

70.     Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of their goods and services in violation of the ICFA, including:

      i.  collecting and disseminating Plaintiff's and Class Members' vehicle driving data, including location data;

     ii.  failing to enact proper opt-in procedures before collecting and disseminating Plaintiff's and Class Members' vehicle driving data, including location data;

   iii.  omitting, suppressing, and concealing the data collection and dissemination practices of Defendants; and

   iv.  knowingly and fraudulently misrepresenting that Defendants would comply with the requirements of relevant federal and state laws pertaining to the privacy Plaintiff's and Class Members' vehicle driving data, including location data.

71.     These actions also constitute deceptive and unfair acts or practices because Defendants knew the facts about their data collection and dissemination practices. Defendants' failure to comply with applicable state and federal laws and industry standards would be unknown to (and not easily discoverable by) Plaintiff and the Class, and would defeat their reasonable expectations about the privacy of their vehicle driving information, including location data.

72.     Defendants intended that Plaintiff and the Class rely on their deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendants' offering of goods and services.

73.     Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

74.     As a result of Defendants' wrongful conduct, Plaintiff and the Class were injured in that they never would have purchased or used Defendants' goods and/or services, had they known or been made aware that Defendants collected and disseminated their vehicle driving data to third parties.

75.     As a direct and proximate result of Defendants' violations of the ICFA, Plaintiff and the Class have suffered harm as set forth in detail above.

76.     The requested relief by Plaintiff will assist consumers because it will require Defendants to cease their illegal data collection and dissemination practices. To that extent, the Complaint seeks injunctive relief and any monetary compensation that will deter Defendants from additional and future illegal data collection and dissemination practices.

**COUNT III**
**Violations of the Pennsylvania Unfair Trade Practices**
**and Consumer Protection Law,**
**73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq*.**
**(On Behalf Plaintiff Winkelvoss and the Pennsylvania Class)**

77.     Plaintiff Winkelvoss ("Plaintiff" for the purposes of this count) realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78.     This claim is brought on behalf of Plaintiff Winkelvoss and the Pennsylvania Class.

79.     are "persons," as meant by 73 Pa. Cons. Stat. § 201-2(2).

80.     Plaintiff and Pennsylvania Class Members purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

81.     Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including:

  i.    Representing that their goods and services have characteristics, uses, benefits, and qualities that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

  ii.   Representing that their goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201-2(4)(vii)); and

  iii.  Advertising their goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

82.     Defendants' unfair or deceptive acts and practices include:

  i.    Failing to adopt reasonable privacy practices to obtain informed consent of Plaintiff and Pennsylvania Class Members before collecting, storing, disseminating, and/or selling their vehicle driving data;

  ii.   Failing to comply with common law and statutory duties pertaining to the privacy of Plaintiff's and Pennsylvania Class Members' vehicle driving data, including duties imposed by state consumer protection laws, and the FCRA;

  iii.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Pennsylvania Class Members' vehicle driving data;

  iv.   Misrepresenting that it would comply with common law and statutory duties pertaining to the privacy of Plaintiff's and Pennsylvania Class

Members' vehicle driving data, including duties imposed by state consumer protection laws, and the FCRA;

v. Omitting, suppressing, and concealing the material fact that they collected and disseminated Plaintiff's and Pennsylvania Class Members' vehicle driving data; and

vi. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the privacy of Plaintiff and Pennsylvania Class Members' vehicle driving data, including duties imposed by state consumer protection laws, and the FCRA.

83. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the data collection and dissemination capabilities of their vehicles.

84. Defendants intended to mislead Plaintiff and Pennsylvania Class Members and induce them to rely on their misrepresentations and omissions.

85. Had Defendants disclosed to Plaintiff and Pennsylvania Class Members that their vehicles would collect and disseminate their driving data to third parties, they would not have purchased or leased their vehicles or would not have used Defendants' services. Instead, Defendants never disclosed to Plaintiff and Pennsylvania Class Members their data collection and dissemination practices. Accordingly, Plaintiff and Pennsylvania Class Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

86. Defendants acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff's and Pennsylvania Class Members' rights.

87. As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices and Plaintiff's and Pennsylvania Class Members' reliance on them, Plaintiff and Pennsylvania Class Members have

suffered and will continue to suffer injury and actual harm in the form of, *inter alia*: (a) the collection, storage, dissemination, and/or unauthorized sale of their vehicle driving data, including location data; (b) the lease or purchase of vehicles that are fundamentally different from what they believed they were purchasing, less valuable than was represented, and less valuable than what they actually received; and (c) the continued storage and dissemination of their vehicle driving data, including location data.

88.     Plaintiff and Pennsylvania Class Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $100 (whichever is greater), treble damages, restitution, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

## COUNT IV
### Intrusion Upon Seclusion
### (On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)

89.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

90.     Plaintiffs and Class Members have reasonable expectations of privacy in their vehicles and with their movements, generally.  Plaintiffs' and Class Members' private affairs include their locations.

91.     The reasonableness of such expectations of privacy is supported by Defendants' unique position to monitor Plaintiffs' and Class Members' behavior through their access to Plaintiffs' and Class Members' vehicles. It is further supported by the surreptitious and non-intuitive nature of Defendants' tracking practices.

92.     Defendants intentionally intruded on and into Plaintiffs' and Class Members' solitude, seclusion, or private affairs by intentionally collecting and transmitting information via the systems in their vehicles.

93.     These intrusions are highly offensive to a reasonable person.

94.      Plaintiffs and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

95.   Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class Members.

96.   As a result of Defendants' actions, Plaintiffs and Class Members seek statutory damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class Members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class Members and were made in conscious disregard of Plaintiffs' and Class Members' rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

## COUNT V
**Unjust Enrichment (Quasi-Contract Claim for Restitution
and Disgorgement) or, Alternatively, Breach of Contract
(On Behalf of All Plaintiffs and the Nationwide Class Against All Defendants)**

97.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

98.   Plaintiffs and Class Members unwittingly conferred a benefit upon Defendants.

99.   Defendants took and retained valuable personal location information belonging to Plaintiffs and Class Members when they intentionally and comprehensively tracked their vehicle locations and driving behaviors without their consent.

100.   Defendants were enriched when they utilized Plaintiffs' and Class Members' location information, gathered without consent, for their own financial advantage to sell in its raw form, or use to create reports or other analyses for sale, including, but not limited to, reports of Plaintiffs' and Class Members' driving behaviors for automobile insurers.

101.   In exchange for Plaintiffs' and Class Members' loss of privacy and the financial benefits Defendants enjoyed as a result thereof, including, but not limited to, profits from the sale of the location data, and reports based on that location data, Plaintiffs and Class Members received nothing.

102.   It would be inequitable for Defendants to retain the benefits they have unjustly received. Therefore, as a result of Defendants' actions, Plaintiffs and Class Members seek an order that Defendants disgorge the profits and other benefits they have unjustly obtained.

103.   Alternatively, to the extent Defendants successfully assert that any terms of service form a binding contract that sufficiently defines the parties' rights regarding Defendants' use of Plaintiffs' and Class Members' location information, thereby rendering a claim for unjust enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that Defendants' conduct constitutes a breach of any such binding contract, including, but not limited to, the covenant of good faith and fair dealing implied into every contract. Defendants did not adequately disclose prior to collecting or selling Plaintiffs' and Class Members' vehicle location data that it would or could be sold to automobile insurance companies with whom Plaintiffs and Class Members had an ongoing, or prospective relationship. By virtue of Defendants' conduct as alleged herein, including the sale of Plaintiffs' and Class Members' location information without adequate disclosure beforehand, Defendants breached the covenant of good faith and fair dealing implied into every contract, including any applicable terms of service.

**COUNT VI**
**Violation of the Fair Credit Reporting Act**
**(On Behalf of All Plaintiffs and the FCRA Class against Defendant Verisk)**

104.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

105.   Defendant Verisk is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f).

106.   As alleged in more detail above, Defendant Verisk collected Plaintiffs' driving data and incorporated into consumer reports, as defined in 15 U.S.C. § 1681a(d), which it disseminated to insurance companies and financial institutions.

107.   As a consumer reporting agency, Defendant Verisk is required to follow reasonable procedures "to assure maximum possible accuracy of the information concerning" individuals in consumer reports that it disseminates.  15 U.S.C. § 1681e(b).

108.   Defendant Verisk failed to maintain procedures to maintain maximum possible accuracy regarding Plaintiffs' and FCRA Class Members' driving data.

109.   Upon information and belief, the uncontextualized, misleading, and personal driving information in the consumer reports disseminated by Defendant Verisk harmed Plaintiffs, including by significantly raising their insurance premiums and/or resulting in the denial of coverage.

110.   With certain exceptions not applicable here, under 15 U.S.C. § 1681b, Defendant Verisk "may furnish a consumer report relating to any consumer . . . in connection with any credit or insurance transaction that is not initiated by the consumer only if . . . the consumer authorizes the agency to provide such reports to such person."

111.   Plaintiffs and FCRA Class Members did not authorize Defendant Verisk to include driving data in consumer reports about them.

112.   As a result of each and every willful violation of the FCRA, Plaintiffs are entitled to actual damages as the Court may allow under 15 U.S.C. § 1681n(a)(1); statutory damages under 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow under 15 U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs under 15 U.S.C. § 1681n(a)(3).

113.   As a result of each and every negligent violation of the FCRA, Plaintiffs are entitled to actual damages as the Court may allow under 15 U.S.C. § 1681o(a)(1); and reasonable attorneys' fees and costs under 15 U.S.C. § 1681o(a)(2).

1

## **REQUEST FOR RELIEF**

2      WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

3  respectfully request that the Court enter judgment in their favor and against Defendants as

4  follows:

5      A.   Certifying the Class under Federal Rule of Civil Procedure 23 as requested
           herein;
6

7      B.   Appointing Plaintiffs as Class Representatives and undersigned counsel as
           Class Counsel;
8

9      C.   Finding that Defendants engaged in the unlawful conduct as alleged herein;

10     D.   Awarding Plaintiffs and the other Class Members actual, compensatory, and
           consequential damages;
11

12     E.   Awarding Plaintiffs and the other Class Members statutory damages;

13     F.   Awarding Plaintiffs and the other Class Members declaratory and injunctive
           relief;
14

15     G.   Awarding Plaintiffs and the other Class Members restitution and
           disgorgement;

16     H.   Awarding Plaintiffs and the other Class Members exemplary damages, should
17          the finder of fact determine that Defendants acted with malice or oppression;

18     I.   Awarding Plaintiffs and the other Class Members pre-judgment and post-
           judgment interest on all amounts awarded;
19

20     J.   Awarding Plaintiffs and the other Class Members reasonable attorneys' fees,
           costs, and expenses; and
21

22     K.   Granting such other relief as the Court deems just and appropriate.

23

24

25

26

27

28

1

## **JURY TRIAL DEMAND**

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated:  May 23, 2024                    Respectfully submitted,


*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert R. Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Christopher Stiner (SBN 276033)
cstiner@ahdootwolfson.com
Deborah De Villa (SBN 312564)
ddevilla@ahdootwolfson.com
**AHDOOT & WOLFSON, P.C.**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505-4521
Telephone: (310) 474-9111
Facsimile:  (310) 474-85

*Attorneys for Plaintiffs and the Putative Classes*

CLASS ACTION COMPLAINT